AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



| UNITED STATES OF AMERICA | |
|---|---|
| v. | |
| ANTHONY MORALEZ,<br> aka "Doughboy,"<br> aka "Danger,"<br> aka "Meatball,"<br> aka "Anthony Morales," | |
| Defendant. | |

**FILED**
CLERK, U.S. DISTRICT COURT
02/13/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: GR DEPUTY

Case No.      2:23-mj-00690-duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of November 28, 2022, in the county of Santa Barbara in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Christopher Stantzos*
*Complainant's signature*

Christopher Stantzos, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      February 13, 2023

*Judge's signature*

City and state:  Los Angeles, California

Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA: David C. Lachman (x5564)

### <u>AFFIDAVIT</u>

I, Christopher Stantzos, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Anthony MORALEZ, also known as ("aka") "Doughboy," aka "Danger," aka "Meatball," aka "Anthony Morales" ("MORALEZ"), for a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Ammunition).

2.    This affidavit is also made in support of a warrant to search a black T-Mobile cellphone, with IMEI number 357492491246169, currently in the custody of the Lompoc Police Department in Lompoc, California, as more fully described in Attachment A (the "SUBJECT DEVICE").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearms and Ammunition), 21 U.S.C. § 841(a)(1) (Distribution of and Possession with Intent to Distribute Controlled Substances), and 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute and Possess with Intent to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are approximate.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since March 2020.  I attended the ATF Academy from March through December 2020, where I received approximately 1,000 hours of formal training in various aspects of conducting firearms, explosives, arson, firearms trafficking, and gang investigations.  Before joining the ATF, I was an Intelligence Analyst for the Federal Bureau of Investigation ("FBI") for approximately four and a half years.  In that role, I produced intelligence products in furtherance of civil rights crimes investigations and complex international money laundering investigations.  Before joining the FBI, I was a forensic scientist for the Washington, DC Department of Forensic Sciences, where I identified, documented, preserved, and collected physical evidence from crime scenes for nearly two years.

6.    As an ATF agent, I have debriefed multiple informants, witnesses, and subjects who had personal knowledge regarding illegal firearms and drug trafficking.  Additionally, I have participated in many aspects of gang, firearms, and drug

trafficking investigations, including undercover operations, arrests, physical and digital device search warrants, physical and electronic surveillance, GPS tracker installations, and the analysis of telephone call detail records.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of firearm-trafficking and drug-trafficking, and money-laundering methods used to conceal the nature of the proceeds.  I am familiar with the methods employed by individuals involved in firearms and drug trafficking to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.   On November 23, 2022, MORALEZ, a convicted felon, fired six shots at a Toyota Camry sedan as it was driving away from MORALEZ in Lompoc, California.  In the immediate aftermath of the shooting, which was captured on city surveillance video, Lompoc Police Department ("LPD") detectives recovered six spent .380 caliber casings from the scene of the shooting.  The six ammunition casings were manufactured outside the state of California and must have moved in interstate commerce to have been recovered in California.

8.   Five days later, on November 28, 2022, LPD detectives arrested Anthony Moralez ("MORALEZ") near Thompson Park in Lompoc, California.  During a search of MORALEZ's person,

detectives found a California-manufactured .380 AMT pistol in the right front pocket of MORALEZ's jeans, loaded with three rounds of SIG .380 Auto ammunition in the magazine and one round in the chamber.  The four rounds of ammunition were manufactured outside the state of California and must have moved in interstate commerce to have been recovered in California.  The SUBJECT DEVICE was seized from MORALEZ at this time.

9.    At the time of the shooting, MORALEZ was on Post Release Community Supervision ("PRCS") following his release from state custody on September 19, 2022, after serving time for felony convictions for assault with a deadly weapon, carrying a loaded firearm, and felon in possession of a firearm.

## IV. STATEMENT OF PROBABLE CAUSE

10.    Based on my review of law enforcement reports, video footage, conversations with other law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

### A.    MORALEZ Fires Six Rounds of .380 Ammunition at a Toyota Camry Sedan on November 23, 2022

11.    Based on my review of Lompoc city surveillance video and LPD reports, at approximately 1:07 p.m. on November 23, 2022, MORALEZ fired six shots at an occupied Toyota Camry sedan in the vicinity of 408 West Maple Avenue in Lompoc, California.

a.    At approximately 1:05 PM on November 23, 2022, MORALEZ, a member of the Westside VLP street gang, was walking eastbound along West Maple Avenue in Lompoc, California, with V.H., a fellow Westside VLP gang member.  MORALEZ was wearing a

black puffer jacket, glasses, a black Lakers hat with embroidery on the sides, and a ski mask.

b.    As MORALEZ and V.H. reached the intersection of West Maple Avenue and K Street, a gray Toyota Camry made a left turn in front of them.  MORALEZ and V.H. turned towards the car and appeared to say or shout something.  According to LPD reports, MORALEZ yelled "What's up?" at the Camry.

c.    According to surveillance video and LPD reports, the Camry made an abrupt U-turn, headed back towards MORALEZ and V.H., and stopped in the middle of the street.  Four men got out of the Camry, and a brief discussion ensued between MORALEZ and the man who exited the left rear passenger-side door, later identified by LPD detectives as M.A.C.  M.A.C. yelled, "What's up then?" to MORALEZ and V.H., and stated that he was willing to "get down," which in my training and experience means to fight. According to LPD reports, MORALEZ replied, "You don't want it here," and said something about the VLP gang.  The entire discussion lasted about less than a minute.

d.    According to surveillance video and LPD reports, M.A.C. turned around and headed back towards the Camry, and the other three men also began getting back into the car.  While MORALEZ was backing away, still facing the Camry, a gunshot rang out.  MORALEZ's right hand was not exposed at the time, and he does not appear to be the initial shooter.  M.A.C. had his right hand in his pocket, and his left hand was exposed but empty. The three other occupants of the Camry all flinched.  V.H. also appeared surprised by the gunshot and flinched.  At that point,

M.A.C. and the three other men got into the Camry and began to
drive away, heading eastbound on West Maple Avenue.

       e.   According to surveillance video and LPD reports,
MORALEZ positioned himself behind a maroon pickup truck parked
in the driveway at 408 West Maple Avenue.  As the Camry drove
away, MORALEZ fired six shots at the car.  MORALEZ and V.H. then
ran westbound towards the 400 North K/L alley and out of view of
the camera that captured the shooting.

    12.  According to surveillance video and LPD reports, LPD
detectives responded to the scene of the shooting.  LPD
detectives canvassed the area and found six .380 caliber
cartridge casings in the immediate vicinity of the maroon pickup
truck, as follows:  four SIG .380 Auto casings; one Federal .380
Auto casing; and one Ammo Inc. .380 Auto casing.  All of the
casings were found within a few feet from each other near the
maroon pickup truck where MORALEZ was positioned.

    13.  Although MORALEZ's face was obscured by a ski mask
during the incident, I believe that the shooter was MORALEZ
based on my review of surveillance video, LPD reports, and a
California Department of Motor Vehicles photograph of MORALEZ.
According to video obtained from a nearby liquor store, MORALEZ
and V.H were at the store at approximately 12:18 PM on November
23, 2022.  According to Google Maps, the liquor store, which is
located at 801 West Laurel Avenue, is a seven-minute walk from
the scene of the shooting.  In the store video, MORALEZ can be
seen standing outside the store smoking a cigarette, with his

ski mask pulled down exposing his face.[1]  At least one of his facial tattoos, depicting the letters "VL" on his right cheek, is visible in the video.  On the video from the liquor store, MORALEZ is wearing the same clothing as the shooter on the city surveillance video, including the same glasses, black puffer jacket, and black Lakers hat.  City surveillance video recordings also show that MORALEZ and V.H. left the liquor store, went to V.H.'s house on North O Street, approximately a two-minute walk from the store, and then walked down Maple Avenue towards the scene of the shooting.  According to LPD reports, one of the passengers in the Camry also identified MORALEZ by name as the shooter.  Additionally, as described below, when MORALEZ was arrested five days later, he had a pistol loaded with four rounds of .380 SIG auto ammunition, which matched four of the cartridge casings found at the scene of the shooting.

**B.    MORALEZ Had a Pistol Loaded with Four Rounds of .380 Ammunition on November 28, 2022**

14.   On November 23, 2022, LPD issued a bulletin pursuant to section 836 of the California Penal Code for the arrest of the shooting suspect.  Although the bulletin does not identify MORALEZ by name, LPD detectives confirmed MORALEZ's identity at approximately 5:30 p.m. on November 23, 2022, after viewing the surveillance videos from the liquor store.

---

[1] The store owner refused to provide LPD detectives with an electronic copy of the video, but he allowed one of the detectives to record the video with his work cell phone.  I have reviewed the video, and MORALEZ's face and "VL" tattoo on his right check are visible in the recording.

15.   According to LPD reports and my review of MORALEZ's criminal history reports, MORALEZ was on Post-Release Community Supervision ("PRCS") following his release from state custody on September 19, 2022, after serving time for three felony convictions.  LPD detectives knew that MORALEZ was on PRCS before they arrested him on November 28, 2022.  MORALEZ's PRCS was also revoked on November 28, 2022.

16.   According to LPD reports and my review of surveillance video, on November 28, 2022, LPD detectives encountered MORALEZ as he was walking near Thompson Park, which is located near MORALEZ's residence in Lompoc.  LPD detectives approached MORALEZ, announced their presence, stated that MORALEZ was under arrest, and ordered MORALEZ to get down on the ground.  MORALEZ complied, got on the ground, and volunteered that he had a gun in his right pocket.  LPD detectives saw a chrome pistol in plain view protruding from MORALEZ's right front jeans pocket.

17.   The firearm MORALEZ possessed is a chrome Arcadia Machine & Tool ("AMT"), model AMT Back Up, .380 caliber pistol, bearing serial number B04775.  The AMT pistol, which was loaded with four rounds of SIG .380 auto ammunition, had one bullet in the chamber and three bullets in the magazine.  The AMT pistol is the same caliber as the cartridge casings found at the shooting scene, and the four SIG .380 auto cartridge casings found at the scene of the November 23rd shooting match the four SIG .380 auto rounds of ammunition loaded in the AMT pistol.

18.   LPD detectives arrested MORALEZ on charges of violating California Penal Code sections 245 (Assault Person

with a Semiautomatic Firearm), 246 (Shoot at Inhabited
Dwelling/Vehicle/Etc.), 30305(a) P.C. (Possession of Ammunition
by Prohibited Person), and 29800(a) (Possession of a Concealed
Firearm by a Felon).

19.  LPD detectives also seized the loaded AMT pistol and
the SUBJECT DEVICE from MORALEZ.  Pursuant to MORALEZ's PRCS
search conditions, LPD detectives attempted to access the
contents of the SUBJECT DEVICE but were unable to defeat the
phone's security features.  LPD detectives booked the SUBJECT
DEVICE into evidence.

**C.   During a Search of MORALEZ's Residence, LPD Detectives
Find Suspected Methamphetamine**

20.  On November 28, 2022, after MORALEZ's arrest, LPD
detectives searched MORALEZ's residence at 536 North T Street,
Unit C, in Lompoc, California pursuant to MORALEZ's PRCS search
conditions.  MORALEZ's PCRS search conditions permit the
warrantless search of MORALEZ's person, residence, and any other
property under his control at any time by any law enforcement
officer.

21.  According to LPD reports, during the search of
MORALEZ's residence, detectives found four bindles of suspected
methamphetamine, each containing between 1.6 grams and 2.6 grams
of suspected methamphetamine, in the coin pocket of a pair of
jeans in the living room.  The four bindles were each packaged
in a clear wrapper and had a total gross weight, including
packaging, of approximately 8.2 grams.  The suspected
methamphetamine has not yet been lab tested.

22.  LPD detectives also located a black puffer jacket, which appears to be the jacket MORALEZ was wearing during the shooting on November 23, 2022.

**D.  MORALEZ is a Convicted Felon**

23.  On or about December 27, 2022, I reviewed MORALEZ's criminal history and certified conviction documents and learned that MORALEZ has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.  On or about September 14, 2022, a violation of California Penal Code section 29850(c)(6), Carrying a Loaded Handgun: Not Registered Owner, in the Superior Court of California, in the county of Santa Barbara, Case Number 21CR05148.

b.  On or about September 14, 2022, a violation of California Penal Code section 245(a)(4), Assault with a Deadly Weapon with Force: Possible Great Bodily Injury, in the Superior Court of California, in the county of Santa Barbara, Case Number 21CR05148.

c.  On or about January 11, 2022, a violation of California Penal Code Section 29800(a)(1), Felon in Possession of Firearm, in the Superior Court of California, in the county of Santa Barbara, Case Number 21CR08295.

**E.  Interstate Nexus**

24.  I am an ATF Firearms and Interstate Nexus Expert.  On or about December 21, 2022, I reviewed photographs and descriptions of the four rounds of SIG .380 auto caliber

ammunition that were loaded into the Arcadia Machine & Tool
("AMT"), Model Back Up, .380 caliber pistol, bearing serial
number B04775, that LPD detectives found on MORALEZ's person on
November 28, 2022.  I confirmed that the four rounds of
ammunition were manufactured in either Kentucky or Arkansas.
Because the ammunition was found in California, I believe that
the ammunition has traveled in and affected interstate commerce.

25.  On or about February 9, 2023, I reviewed the six
cartridge casings recovered from the scene of the shooting by
LPD detectives on November 23, 2022.  I determined that the six
cartridge casings, which qualify as ammunition under 18 U.S.C.
§ 921(a)(17)(a), were manufactured outside the state of
California.  Because the ammunition was found in California, I
believe that it has traveled in and affected interstate
commerce.

### V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

26.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.  Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in places that are readily
accessible, and under their physical control, such as their
digital devices.  It has been my experience that prohibited
individuals who own firearms illegally will keep the contact
information of the individual who is supplying firearms to

prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

27.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences and vehicles, including in the form of calendar entries and location data.

e.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

28.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

14

hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

30.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

31.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress Anthony MORALEZ's thumb and/or fingers
on the device(s); and (2) hold the device(s) in front of Anthony
MORALEZ's face with his or her eyes open to activate the
facial-, iris-, and/or retina-recognition feature.

32.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VIII.      <u>CONCLUSION</u>

33.  For all of the reasons described above, there is probable cause to believe that Anthony MORALEZ has committed a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Ammunition).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>13th</u> day of
February 2023.

THE HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

<u>DEVICE TO BE SEARCHED</u>

The following digital device (the "SUBJECT DEVICE"), seized by Lompoc Police Department detectives on November 28, 2022, and currently maintained in the custody of the Lompoc Police Department in Lompoc, California:  a black T-Mobile cellphone, with IMEI number 357492491246169.

## ATTACHMENT B

**I.    ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearms and Ammunition), 21 U.S.C. § 841(a)(1) (Distribution of and Possession with Intent to Distribute Controlled Substances), and 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute and Possess with Intent to Distribute Controlled Substances) (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device and which relate to the above-named violations;

d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.   Records, documents, programs, applications, materials, or conversations relating to the possession, purchase, or sale of firearms or ammunition;

f.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of firearms, ammunition, or drugs;

g.   Contents of any calendar or date book;

h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

i.   Any SUBJECT DEVICE which is itself or which contains evidence, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

j.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were

created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.  evidence of the presence or absence of software that would allow others to control the device;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include

records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.    In searching the SUBJECT DEVICE (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") may
search any SUBJECT DEVICE capable of being used to facilitate
the above-listed violations or containing data falling within
the scope of the items to be seized.

b.    The search team will, in its discretion, either
search the SUBJECT DEVICE where it is currently located or
transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

c.    The search team shall complete the search of the
SUBJECT DEVICE as soon as is practicable but not to exceed 120
days from the date of issuance of the warrant.  The government
will not search the digital device(s) and/or forensic images
thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

d.    The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

5. During the execution of this search warrant, law enforcement is permitted to: (1) depress Anthony MORALEZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Anthony MORALEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.